### IN THE UNITED STATES DISTRICT COURT
### FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

MENACHEM PRI-HAR,           :    CIVIL NO. 1:CV-00-1635

         **Petitioner**    :  (Judge Caldwell)

        **v.**             :

JANET RENO, Attorney General of :
the United States, CHARLES W.  :
ZEMSKI, Acting District      :
Director                   :

FILED
HARRISBURG, PA
DEC 14 2000
MARY E. D'ANDREA, CLERK

### RESPONSE TO SHOW CAUSE ORDER

## I.   INTRODUCTION

On September 14, 2000, Petitioner Menachem Pri-har filed the instant Petition for Writ of Habeas Corpus. As Respondents, he names Janet Reno, the Attorney General of the United States, and Charles Zemski, Acting District Director of the Immigration and Naturalization Service (INS). On November 14, 2000, the Court issued an Order to Show Cause directing Respondents to respond to the allegations in the petition. After obtaining a brief extension of time, presently, Respondents file their Response to the Show Cause Order.

## II.  PROCEDURAL AND FACTUAL HISTORY

Pri-har is a native and citizen of Israel. Ex. 2. Pri-har entered the United States on or about March 27, 1993 as a nonimmigrant. Id. On October 23, 1993, Pri-har was indicted in the Southern District of New York on twenty-four counts charging him with fraudulently obtaining in excess of $84 million in loans and government subsidies from the United States Department of

Agriculture.[1] <u>See</u> <u>Pri-har v. United States</u>, 83 F. Supp.2d 393,
395 (S.D.N.Y. 2000). On January 10, 1994, after a jury trial,
Pri-har was found guilty on all twenty-four counts. <u>Id.</u> at 396.
On July 20, 1994, Pri-har was sentenced to 168 months of
imprisonment, and a five year term of supervised release. <u>Id.</u>
<u>See</u> <u>also</u> Ex. 1. Pri-har is currently serving his fourteen-year
term of imprisonment at the Federal Correctional Institution Fort
Dix, New Jersey. His projected release date is June 9, 2005.
Ex. 3.

On May 8, 2000, the INS issued Pri-har a Notice of Intent to
Issue Final Administrative Removal Order,[2] charging him as being
deportable as an aggravated felon pursuant to § 237(a)(2)(A)(iii)
of the Immigration and Nationality Act (INA), 8 U.S.C.
§ 1227(a)(2)(A)(iii). Ex. 2. On August 10, 2000, based on Pri-
har's own admissions, the INS issued a final removal order
finding that he was not a citizen or national of the United

_____

[1] The various counts with which Pri-har was charged are as
follows: (1) conspiracy to defraud the United States Department
of Agriculture, 18 U.S.C. § 371; (2) defrauding the United States
Department of Agriculture, 18 U.S.C. § 714m(a) (eight counts);
(3) conspiracy to commit bank fraud, 18 U.S.C. § 371 (three
counts); (4) bank fraud, 18 U.S.C. §§ 1344, 1342 (five counts);
(5) conspiracy to commit wire fraud, 18 U.S.C. § 371; (6) wire
fraud, 18 U.S.C. § 1343 (four counts); and (7) making false
statements on a loan application, 18 U.S.C. §§ 1014, 1012 (two
counts). Pet. at 2-3; Ex. 1.

[2] Because Pri-har was not a permanent resident of the
United States, the INS chose to utilize the removal procedures
authorized under Immigration and Nationality Act § 238(b), 8
U.S.C. § 1228(b).

States, not lawfully admitted for permanent residence, and that he had been convicted of an aggravated felony. Exs. 4, 5. The INS directed Pri-har's removal to Israel. Ex. 4.

In the present petition, Pri-har challenges the INS's failure to consider his application for discretionary relief from removal under either former INA § 212(c) or former § 212(h). Pri-har argues that because the criminal conduct upon which the INS's order of removal is based occurred prior to the recent amendments to the INA which eliminated the availability of either type of discretionary relief for criminal aliens like Pri-har, application of these amendments to him constitutes an impermissible retroactive application of the law. Pri-har also contends that pursuant to Sandoval v. Reno, 166 F.3d 225 (3d Cir. 1999), the recent amendments to the INA which eliminated the availability of § 212(c) relief for criminal aliens like himself, constitutes an impermissible retroactive application of the law because his removal proceedings were pending at the time of the amendments. Pri-har's arguments lack merit and for the reasons articulated below, must be rejected.

## III. **ARGUMENT**

### A.    **Background Law - Recent Changes to the INA**

Prior to its recent amendment, under § 212(c) of the INA, the Attorney General, in the exercise of her discretion, could "waive" the immigration consequences of a criminal alien's

convictions, if the alien was otherwise statutorily eligible for relief. See INA § 212(c), 8 U.S.C. § 1182(c) (1990). See also DeSousa v. Reno, 190 F.3d 175, 179 (3d Cir. 1999). Section 440(d) of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. Law. No. 104-132, 110 Stat. 1214 (April 24, 1996), eliminated the availability of this type of relief for certain criminal aliens subject to deportation, rather than exclusion proceedings. See INA § 212(c), 8 U.S.C. § 1182(c) (as amended). See also DeSousa, 190 F.3d at 179 n.4. The most recent amendments to the INA eliminated the availability of § 212(c) relief altogether for aliens placed in proceedings after April 1, 1997. See Section 304(b) of Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), Pub. L. No. 104-208, 110 Stat. 3009 (Sept. 30, 1996), as amended by the Extension of Stay in United States For Nurses Act of October 11, 1996, Pub. L. No. 104-302, § 2, 110 Stat. 3656 (October 11, 1996). See also DeSousa, 190 F.3d at 179 n.4. IIRIRA replaced § 212(c) with the new INA § 240(a), which states that the Attorney General may cancel the removal of certain inadmissable or deportable aliens. 8 U.S.C. § 1229b(a). See also DeSousa, 190 F.3d at 182 n.7. However, aggravated felons, like Pri-har, are not eligible for the cancellation of removal. See 8 U.S.C. § 1229b(a)(3).

Section 212(h) of the INA, like former § 212(c), permits the Attorney General to waive certain deportation orders.  See Catney v. INS, 178 F.3d 190, 193 (3d Cir. 1999); Hypolite v. Blackman, 57 F. Supp.2d 128, 132-33 (M.D. Pa. 1999) (Caldwell, J.). Section 212(h) allows the Attorney General to do so for those persons subject to deportation due to their commission of certain crimes if the alien is:

> the spouse, parent, son, or daughter of a citizen of the United States or an alien lawfully admitted for permanent residence if it is established to the satisfaction of the Attorney General that the alien's denial of admission would result in extreme hardship to the United States citizen or lawfully resident spouse, parent, son, or daughter of such alien;  and the Attorney General, in his discretion, ... has consented to the alien's applying or reapplying for a visa, for admission to the United States, or adjustment of status.

8 U.S.C. § 1182(h)(1)(B), (h)(2) (1994 & Supp. II 1996).

Section 348(a) of IIRIRA, however, added language to § 212(h) making aggravated felons like Pri-har ineligible to apply for such discretionary relief.  See 8 U.S.C. § 1182(h). See also Hypolite, 57 F. Supp.2d at 133.  In addition, IIRIRA provides that the amendment made by § 348(a) "shall be effective on the date of enactment of this Act [September 30, 1996] and shall apply in the case of any alien who is in exclusion or deportation proceedings as of such date unless a final administrative order in such proceedings has been entered as of

such date."    IIRIRA § 348(b), 110 Stat. at 3009-639.    See also

Catney, 178 F.3d 193-94 n.5.

> **B.    Application of the Recent Statutory Amendments
> Eliminating the Availability of §212(c) and § 212(h)
> Relief to Pri-har Is Not an Impermissible Retroactive
> Application of the Law**

In the instant case, the INS commenced Pri-har's removal

proceedings on May 8, 2000, with its issuance of a Notice to

Issue Final Administrative Removal Order.    At that time, Congress

had repealed § 212(c) in its entirety.    See DeSousa, 190 F.3d at

179 n.4.    Thus, the only issue involving § 212(c) is whether

IIRIRA § 304(b)'s repeal of § 212(c) is impermissibly

retroactively applied to Pri-har.

In DeSousa, the Third Circuit addressed the question of

whether amended AEDPA § 440(d)'s elimination of § 212(c) relief

for certain criminal aliens whose criminal conduct predated

AEDPA's effective date constituted an impermissible retroactive

application of the law.    190 F.3d at 185-87.    The court concluded

that it did not.    The DeSousa court's reasoning applies with

equal force in the instant case, where at the time of the

commencement of Pri-har's removal proceedings, § 212(c) relief

was altogether unavailable.    Thus, Pri-har fails on his claim

that IIRIRA's repeal of § 212(c) is impermissibly retroactive as

applied to him.

Pri-har's claim that IIRIRA § 348(a)'s amendments to

§ 212(h) are impermissibly retroactively being applied to his
case also must be rejected.  First, IIRIRA itself states that its
amendments to § 212(h) shall apply to cases pending on the date
of its enactment.  IIRIRA § 348(b), 110 Stat. at 3009-639.  See
also Catney, 178 F.3d at 193 n.5.  Second, IIRIRA § 348(a)'s
elimination of relief under § 212(h) for aggravated felons like
Pri-har is akin to AEDPA § 440(d)'s amendments to § 212(c).  The
application of § 440(d) to criminal conduct predating AEDPA's
effective date was explicitly upheld in DeSousa.  190 F.3d at
187.  Thus, Pri-har's claim that IIRIRA's amendments to § 212(h)
are being impermissibly applied to his case is in error.

On his third claim, Pri-har implicitly invokes the Third
Circuit's decision in Sandoval v. Reno, in which the court held
that amended § 212(c) could not be applied to deportation
proceedings commenced before and pending on AEDPA's effective
date.  He claims that the INS's issuance of a detainer against
him in August 1, 1994, commenced his removal proceedings, thus,
placing him in removal proceedings prior to IIRIRA § 304(b)'s
repeal of § 212(c).  Pet. at 4.

Presently, the question of when removal proceedings are
deemed to have commenced is an issue being litigated throughout
the country.  See Costa v. INS, ___ F.3d ___, 2000 WL 1725377 (1st
Cir. Nov. 28, 2000) (attached); Morales-Ramirez v. Reno, 209 F.3d

977, 982-83 (7th Cir. 2000); Alanis v. Bustamante v. Reno, 201 F.3d 1303, 1308-09 (11th Cir. 2000); Bury v. Reno, 101 F. Supp.2d 296, 299-300 (E.D. Pa. 2000). The issue is a hotly debated one precisely because of the same claims that Pri-har raises in the instant case. If an alien's removal proceedings began prior to AEDPA's and IIRIRA's amendments to the INA, then the possibility of relief under former § 212(c) and § 212(h) may remain available to him. See e.g. Sandoval, 166 F.3d 225.

The INS's own regulation provide that: "Every removal proceeding conducted under ... [the INA] to determine the deportability or inadmissibility of an alien is commenced by the filing of a notice to appear with the Immigration Court." 8 C.F.R. § 239.1(a). Thus, based on this regulation it is Respondents' position that Pri-har's removal proceedings did not commence until the issuance of the Notice of Intent to Issue of Final Order of removal on May 8, 2000, and that the INS's interpretation of it own regulation, in the face of the INA's silence on the issue, is entitled to deference. Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984). However, at least one court has been reluctant to afford such deference to the INS's interpretation of § 239.1(a), because the determination of when removal proceedings shall be deemed to have commenced is not the type of question involving agency

expertise.  See Sciglitano v. Holmes, 2000 WL 675696, * 3 (E.D.
Pa. May 23, 2000) (attached) (citing Sandoval, 166 F.3d at 225).
Instead, in the face of retroactivity arguments such as Pri-
har's, courts have looked primarily at what point the INS took
actions which gave rise to the alien's reasonable reliance or
expectations in terms of the discretionary relief from removal
that was available to him at that time.  See Alanis-Bustamante,
201 F.3d at 1309-10; Wallace, 194 F.3d at 287.

     Both the Eleventh Circuit in Alanis-Bustamante and the First
Circuit in Wallace determined that when the INS has issued an
order to show cause (OSC) prior to AEDPA's amendments to
§ 212(c), but filed the OSC with the immigration court after
AEDPA's effective date, proceedings commenced with the service of
the OSC rather than the later date of its filing.  See Alanis-
Bustamante, 201 F.3d at 1309-10; Wallace, 194 F.3d at 287.
Respondents do not concede the correctness of those decisions,
and first maintain that § 239.1(a) governs.  Thus, Pri-har's
removal proceedings commenced on May 8, 2000, with the issuance
of the Notice of Intent to Institute Removal proceedings.

     Alternatively, neither Alanis-Bustamante nor Wallace are
instructive for purposes of the instant case.  The only INS
action which preceded IIRIRA's amendments to the INA was its
issuance of a detainer.  Both Alanis-Bustamante and Wallace were
cases in which the INS had served an OSC prior to the changes in

the INA yet filed the OSC after.  The INS's issuance of a
detainer did nothing more than alert Federal Bureau of Prison
officials and Pri-har that it was investigating his removability
from the United States.  The detainer alone did not give the INS
the authority to arrest him, and did not subject him to INS
authority.  Indeed, the detainer instructs the Bureau of Prisons
that its issuance "is for notification purposes only and does not
limit your discretion in any decision affecting the offender's
classification, work, and quarters assignment or other treatment
which he would require."  Pet. Ex. 1.  On this basis, several
courts have held that a "bare detainer letter alone does not
sufficiently place an alien in INS custody to make habeas corpus
available."  <u>Garcia v. Taylor</u>, 40 F.3d 299, 303-04 (9th Cir.
1994)(citing cases), superseded by statute as stated in <u>Camposu</u>
<u>INS</u>, 62 F.3d 311 (9th Cir. 1995).  In the instant case, because
the INS's detainer merely notified Pri-har that it was commencing
an investigation into his possible removal from the United
States, and that the detainer did not subject him to INS custody
or control, no basis exists upon which to argue that the August
1, 1994, detainer commenced Pri-har's removal proceedings.
Moreover, no where in his petition does Pri-har suggest that he
deleteriously relied upon the INS's issuance of the detainer.
Indeed, Pri-har's April 30, 1995, letter to the INS in which he
specifically objected to the fact that the INS <u>had</u> <u>not</u> commenced

deportation proceedings, negates his present ability to claim that he believed the August 1, 1994, detainer to have commenced his removal proceedings. Thus, because the INS began his removal proceedings after IIRIRA's effective date, there has been no impermissible retroactive application of the law and the petition should be denied.

## IV.    CONCLUSION

Based upon the foregoing, Respondents respectfully request that the Court deny the petition.

Respectfully submitted,

DAVID M. BARASCH
UNITED STATES ATTORNEY


DULCE DONOVAN
Assistant U.S. Attorney
228 Walnut Street
Harrisburg, PA 17108
(717) 221-4482


Dated: December 14, 2000

2000 WL 1725377
**(Cite as: 2000 WL 1725377 (1st Cir.))**

Only the Westlaw citation is currently available.

United States Court of Appeals,
First Circuit.

**Jose COSTA, Petitioner,**
v.
**IMMIGRATION AND NATURALIZATION
SERVICE, Respondent.**

**No. 99-2357.**

Argued Nov. 7, 2000.
Decided Nov. 28, 2000.

Non-criminal alien petitioned for review of decision of Board of Immigration Appeals (BIA) dismissing his appeal from order of removal. The Court of Appeals, Selya, Circuit Judge, held that alien was in deportation proceedings, for purposes of statute providing that alien in deportation proceedings as of effective date of Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA) was not subject to IIRIRA's rules providing for cancellation of removal, when Immigration and Naturalization Service (INS) filed Notice to Appeal (NTA) with Immigration Court, and (2) INS was not equitably estopped from proceeding under IIRIRA's rules.

Petition denied.

**[1] Aliens ☞54.3(5)**

24k54.3(5)

Court of Appeals would overlook fact that alien incorrectly named Immigration and Naturalization Service (INS) rather than Attorney General as respondent in petition for judicial review of order of removal, since such error appeared harmless. Immigration and Nationality Act, § 242(b)(3)(A), as amended, 8 U.S.C.A. § 1252(b)(3)(A).

**[2] Aliens ☞54.3(4)**
24k54.3(4)

To extent that petition for review of order of removal presented abstract legal question, Court of Appeals would afford de novo review.

**[3] Aliens ☞54(2)**
24k54(2)
of

Deference was due to Immigration and Naturalization Service (INS) regulation providing that jurisdiction vested over deportation proceedings when charging document was filed with Immigration Court by INS. 8 C.F.R. § 3.14(a).

**[4] Aliens ☞44**
24k44

**[4] Aliens ☞54(1)**
24k54(1)

The Attorney General and the Immigration and Naturalization Service (INS), as her designee, have broad discretion in deciding, administratively, whether and when to pursue deportation against an alien. Immigration and Nationality Act, § 237(a), as amended, 8 U.S.C.A. § 1227(a).

**[5] Aliens ☞54.1(2)**
24k54.1(2)

To overcome the presumption of good-faith action by the government, an alien challenging a deportation decision must articulate specific allegations of bad faith and, if necessary, produce reasonably particularized evidence in support of those allegations; this is a significant burden.

**[6] Aliens ☞40**
24k40

Non-criminal alien was in deportation proceedings, for purposes of Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA) section providing that alien in deportation proceedings as of IIRIRA's effective date was not subject to IIRIRA's rules providing for cancellation of removal, when Immigration and Naturalization Service (INS) filed Notice to Appeal (NTA) with Immigration Court, not previously when INS served alien with any Order to Show Cause (OSC) in response to alien's request to be placed in deportation proceedings; alien did not decide to attempt to accelerate consideration of his immigration status under compulsion of any pending criminal charges, he did not rely to his detriment on prior legal regime, and INS's failure to file with Immigration Court before IIRIRA's effective date was not in bad faith. Omnibus Consolidated Appropriations Act, 1997, § 309(c)(1), 8 U.S.C.A. § 1101 note; 8 C.F.R. § 3.14(a).

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works

**[7] Estoppel** ☞62.2(4)
156k62.2(4)

Failure of Immigration and Naturalization Service (INS) to file Notice to Appeal (NTA) with Immigration Court until after effective date of Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA), resulting in alien being subject to IIRIRA's rules providing for cancellation of removal, did not equitably estop INS from proceeding under such rules, inasmuch as INS engaged in no affirmative misconduct and, because alien had no right to set time when deportation proceedings would be commenced against him, he could not claim reasonable reliance on import of any Order to Show Cause (OSC) issued prior to IIRIRA's effective date. Omnibus Consolidated Appropriations Act, 1997, § 309(c)(1), 8 U.S.C.A. § 1101 note; 8 C.F.R. § 3.14(a).

**[8] Estoppel** ☞62.1
156k62.1

The proponent of an estoppel claim against the government must demonstrate that the traditional elements of an estoppel are present, and also must demonstrate that government agents have been guilty of affirmative misconduct.

**[9] Estoppel** ☞62.1
156k62.1

A private party who presses for an estoppel against the government must establish: (1) the occurrence of affirmative government misconduct (2) engendering a reasonable though erroneous belief that a certain state of affairs exists (3) upon which the private party relies to his or her detriment.

**[10] Estoppel** ☞62.1
156k62.1

Estoppel against the government if it exists at all is hen's-teeth rare.

**[11] Aliens** ☞54(1)
24k54(1)

The Immigration and Naturalization Service (INS) has virtually unfettered discretion with respect to when to initiate a deportation proceeding or filing a served Order to Show Cause (OSC).

**[12] Estoppel** ☞55

156k55

For there to be detrimental reliance, a party claiming equitable estoppel must show that he or she has surrendered a right that he or she possessed.
Lidia M. Sanchez, with whom Cooper & Sanchez was on brief, for petitioner.

Paul D. Kovac, Attorney, Office of Immigration Litigation, United States Department of Justice, with whom David W. Ogden, Acting Assistant Attorney General, Civil Division, and Mark C. Walters, Assistant Director, Office of Immigration Litigation, were on brief, for respondent.

Before SELYA, Circuit Judge, COFFIN and BOWNES, Senior Circuit Judges.

SELYA, Circuit Judge.

*1 Petitioner-appellant Jose Costa, a forty-five-year-old Cape Verdean who has no known criminal record, claims that he was eligible to apply for suspension of deportation, but that the Board of Immigration Appeals (BIA) incorrectly refused to recognize that fact. In the alternative, he claims that the BIA erred by failing to treat him as eligible for suspension of deportation on the basis of equitable estoppel. Finding his arguments unconvincing, we deny his petition for review.

I.
Background

This case plays out against a kaleidoscopic backdrop of recent developments in immigration law. We focus on one small area of change. Prior to April 1, 1997, non-criminal aliens could apply for suspension of deportation, provided that they had accumulated seven years of continuous physical presence in the United States and had satisfied certain other requirements. See Immigration and Nationality Act (INA) § 244, 8 U.S.C. § 1254 (repealed 1997). Congress's enactment of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), Pub.L. No. 104-208, 110 Stat. 3009, 3546 (codified as amended in scattered sections of 5, 8, 18, 28, 42, & 48 U.S.C.), eliminated that option; IIRIRA abolished suspension of deportation entirely and replaced it, effective April 1, 1997, with a more restrictive procedure called cancellation of removal. IIRIRA § 304(a)(3), 8 U.S.C. § 1229b(b)(1) (1999) (replacing INA § 244 with a new § 240A). Eligibility for cancellation of removal requires, inter alia, a minimum of ten years of

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works

continuous physical presence in the United States. Id.

This shifting series of congressional directives makes timing very important. Under those directives, non-criminal aliens placed in deportation proceedings prior to April 1, 1997, are eligible for suspension of deportation if they meet the familiar requirements of INA § 244, whereas those placed in deportation proceedings after that date are eligible only for cancellation of removal under IIRIRA § 340(a)(3). This line-drawing matters here inasmuch as the petitioner satisfies the criteria for INA § 244 relief but not the more stringent criteria imposed by IIRIRA § 340(a)(3). Because he lawfully entered the United States in June of 1989, overstayed his six-month nonimmigrant visa, and made a life for himself here, he had more than seven, but fewer than ten, years of continuous physical presence in the United States when suspension of deportation metamorphosed into cancellation of removal.

With a change in the law looming and the calendar working against him, the petitioner decided to take matters into his own hands. On March 18, 1997 after Congress had passed IIRIRA but prior to the date on which the abolition of INA § 244 took effect the petitioner, accompanied by an attorney, presented himself at the local Immigration and Naturalization Service (INS) office in Providence, Rhode Island, requesting that he be placed in deportation proceedings. He asserts that the INS issued an Order to Show Cause (OSC) at that time, and although the INS questions this assertion in its brief the OSC was never produced in the course of subsequent proceedings we assume arguendo the veracity of the petitioner's account.

**\*2** In all events, the INS did not file the OSC with the Immigration Court prior to the April 1 cut-off date. [FN1] Instead, it served the petitioner with a Notice to Appear (NTA) on June 19, 1997, and thereafter filed the NTA with the Immigration Court.

Given this sequence of events, the petitioner's burden is to show that his case falls under the old regime rather than the new. The adequacy of this showing depends, in the first instance, on the statutory text. In pertinent part, IIRIRA provides that "an alien who is in exclusion or deportation proceedings as of the [statute's] effective date" (April 1, 1997) is not subject to the new rules. IIRIRA § 309(c)(1). The parties interpret this language differently. The petitioner asserts that the issuance of an OSC invariably marks the commencement of

deportation proceedings, and that, therefore, he was in deportation proceedings from and after the date that such a document was served upon him. Since that event occurred prior to April 1, 1997, his thesis runs, the more favorable suspension of deportation paradigm applies to his case. The INS demurs, asserting that the petitioner was not in deportation proceedings until the agency filed the NTA in the Immigration Court. Since that event occurred after April 1, 1997, the INS posits that the less favorable cancellation of removal paradigm applies.

[1][2] The Immigration Judge (IJ) accepted the INS's view, applied the more onerous criteria, rejected the petitioner's estoppel argument, and ordered removal. The petitioner sought further administrative review but the BIA dismissed his appeal. He now prosecutes this petition for judicial review. [FN2] To the extent that the petition presents an abstract legal question concerning the effect, if any, of a served but unfiled OSC on the choice of law seemingly demanded by the confluence of two different statutory schemes, we afford de novo review. Gailius v. INS, 147 F.3d 34, 43 (1st Cir.1998); Fergiste v. INS, 138 F.3d 14, 17 (1st Cir.1998).

II.
Discussion

We divide our analysis into two segments, corresponding to the petitioner's broadsides.

A.
When Deportation Proceedings Commenced

[3] By statute, the Attorney General has authority to "establish such regulations ... as he deems necessary for carrying out his authority under the [immigration laws]." 8 U.S.C. § 1103(a)(3). The Attorney General has delegated this rulemaking power to the INS. 8 C.F.R. § 2.1. The INS's view of when the petitioner first became embroiled in deportation proceedings draws sustenance from a regulation promulgated pursuant to this authority. The regulation provides explicitly that "[j]urisdiction vests, and proceedings before an Immigration Judge commence, when a charging document is filed with the Immigration Court by the Service." 8 C.F.R. § 3.14(a). This regulation hardly could be clearer and, under familiar principles, ordinarily would be entitled to great weight. Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984); Sidell v. Commissioner, 225 F.3d 103, 109 (1st Cir.2000). Here, however, the petitioner

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works

2000 WL 1725377
(Cite as: 2000 WL 1725377, *2 (1st Cir.))

scoffs at the suggestion that deference is due. He claims that our decision in Wallace v. Reno, 194 F.3d 279 (1st Cir.1999), blunts the force of the regulation. Our next task, then, is to determine what effect, if any, Wallace has on the applicability of the regulation in the circumstances at hand.

The Wallace case did not primarily involve IIRIRA, but, rather, a complementary set of changes to the immigration laws effected by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub.L. No. 104-132, 110 Stat. 1214 (1996). Wallace, a native of Jamaica who immigrated to this country in 1988, was convicted of a drug-trafficking offense in February 1996, following a guilty plea. On March 20, 1996 (prior to AEDPA's April 24, 1996, effective date), the INS served him with an OSC challenging his immigration status. It filed the OSC with the Immigration Court on June 14, 1996 (subsequent to AEDPA's effective date). On December 18, 1996, Wallace conceded deportability. An IJ thereafter found him ineligible to apply for a discretionary waiver of deportation under section 212(c), reasoning that the newly-enacted ban on waivers of deportation for aliens convicted of certain aggravated felonies, contained in AEDPA § 440(d), had enlarged the category of statutorily ineligible individuals to include criminal aliens who, like Wallace, had been convicted of drug-trafficking crimes, regardless of length of sentence. [FN3] The BIA dismissed Wallace's administrative appeal.

**\*3** Wallace then filed a habeas application in the district court, "claiming that it was impermissibly retroactive to apply AEDPA's new limitation on waivers to him." Wallace, 194 F.3d at 282. The retroactivity argument pertained directly to Wallace's pre-AEDPA conviction and to the legitimacy of using that conviction as a fulcrum to force him out of the country under the new law. See id. The district court granted the requested relief. Wallace v. Reno, 24 F.Supp.2d 104 (D.Mass.1998). We affirmed, albeit on different grounds. [FN4]

Faced with a close question as to whether the enlarged ban on waivers could constitutionally be applied to a person who, prior to AEDPA's effective date, had pled guilty to a felony which at the time of the plea did not render the perpetrator ineligible for suspension of deportation, we concluded that Congress did not intend the ban on discretionary waivers to operate in so draconian a fashion. Wallace, 194 F.3d at 286-87. In that context, we rejected the INS's contention that 8

C.F.R. § 3.14(a) controlled and held that, for purposes of his habeas case, Wallace had been placed in deportation proceedings on March 20, 1996 (when the INS served him with an OSC). Id. at 287. In that connection, we wrote:

In this case we are not concerned with the INS's internal time tables, starting points, due dates, and the like but with the judicial question of retroactivity. This question turns on considerations unrelated to the purpose of INS regulations primarily (in the absence of statutory guidance) with the evil Congress sought to prevent and the realities of reasonable reliance or settled expectations on the part of litigants. From this standpoint, we think that when an order to show cause is served on the alien, the deportation process has effectively begun and expectations properly form, even if there is no actual reliance.

Id. (emphasis in original).

**\*4** Wallace is inapposite here. There, we were concerned that once criminal proceedings against an alien had begun, the existing rules applicable to suspension of deportation likely would command his attention and foster reliance during his decisionmaking in connection with the pending criminal charges. Id. Given the likelihood that such rules might have played a significant role in the alien's strategic choices when defending against the pre-AEDPA criminal charges (e.g., deciding whether to plead guilty or to stand trial), changing them after the game had started raised a special set of fairness concerns. Id.

The instant case, which involves a non-criminal alien, is a horse of a different hue. Unlike Wallace, the petitioner is not a criminal alien and, unlike Wallace, he is not subject to deportation on the basis of a criminal conviction that left him eligible for section 212(c) relief when it occurred. It follows inexorably that the petitioner was not confronted with the same need to make strategic choices as was a criminal alien in Wallace's position. It likewise follows that retroactivity concerns, central to our decision in Wallace, are absent in this case. Although it is true that, from a theoretical standpoint, the petitioner faced deportation from the time he overstayed his visa, the government did not force him to make choices in reliance on existing law and then pull the rug out from under him by revising that law. Thus, while the petitioner, when he presented himself at the local INS office, might have hoped to take advantage of the favorable rules that he knew were being phased out, the decision to attempt to accelerate consideration of his immigration status was not one made under the

2000 WL 1725377
**(Cite as: 2000 WL 1725377, *4 (1st Cir.))**

compulsion of pending criminal charges (or under any comparable compulsion, for that matter).

Moreover, the petitioner cannot be heard to complain that he was unfairly mousetrapped by the service of an OSC. After all, Congress passed IIRIRA on September 30, 1996 nearly six months before the petitioner self-reported to the Providence INS office. IIRIRA § 309(a), 8 U.S.C.A. § 1101 (Note). The petitioner has not argued that his appearance on the INS's doorstep less than two weeks before the new law's effective date was a coincidence. We safely can assume, therefore, that the petitioner was on notice of the impending shift from suspension of deportation to cancellation of removal when he invited the issuance of an OSC. In light of that fact, he cannot convincingly claim, as could Wallace, that he relied to his detriment on a prior legal regime. [FN5] Cf. Martin v. Hadix, 527 U.S. 343, 360, 119 S.Ct. 1998, 144 L.Ed.2d 347 (1999) (concluding that passage of a statute eliminated retroactivity concerns by placing attorneys on notice of certain fee constraints, thus undermining any reasonable expectation of higher fees in respect to engagements undertaken, but not completed, between the day of passage and the effective date of the fee constraints).

Wallace is inapposite for another reason as well. That case arose in the habeas context. Here, unlike in Wallace, we are dealing with direct review of a BIA order. [FN6] For that reason, "the INS's internal time tables, starting points, ... and the like," immaterial in Wallace, are of critical importance. Straightforward judicial review of an administrative order cannot proceed without reference to agency time tables, starting points, and the like and in this case, straightforward judicial review is all that is necessary. Because the petitioner is a non-criminal alien, he is subject to a simple removal proceeding, with no extraneous concerns about the collateral consequences of past activity. Under such circumstances, the agency's application and interpretation of the pertinent IIRIRA provision, contained in a regulation promulgated under legislative mandate, is controlling as long as it is not obviously erroneous or inconsistent with the language of the statute. Stinson v. United States, 508 U.S. 36, 45, 113 S.Ct. 1913, 123 L.Ed.2d 598 (1993); Sidell, 225 F.3d at 109. The regulation at issue here, 8 C.F.R. § 3.14(a), easily passes this undemanding test.

*5 [4] This is especially true because the Attorney General (and, in turn, the INS, as her designee) has broad discretion in deciding, administratively, whether

and when to pursue deportation against an alien. See Reno v. American-Arab Anti-Discrimination Comm., 525 U.S. 471, 483-85, 119 S.Ct. 936, 142 L.Ed.2d 940 (1999); United States v. Camacho-Bordes, 94 F.3d 1168, 1174 (8th Cir.1996); Cabasug v. INS, 847 F.2d 1321, 1324 (9th Cir.1988); Cervantes v. Perryman, 954 F.Supp. 1257, 1265 (N.D.Ill.1997); see also 8 U.S.C. § 1227(a). The Attorney General's "responsibility in this regard is akin to his responsibility for enforcing the criminal laws: in both situations, he has discretion to refrain from instituting proceedings even though grounds for their commencement may exist." Johns v. Department of Justice, 653 F.2d 884, 889 (5th Cir.1981). An alien illegally in the United States cannot force the Attorney General's hand by the simple expedient of calling attention to his status and demanding immediate action.

In a last-ditch effort to sidestep the regulation, the petitioner argues that the INS acted in bad faith when it failed to file the OSC with the Immigration Court. This argument will not wash.

[5] In United States v. Gertner, 65 F.3d 963 (1st Cir.1995), we explained what was necessary to overcome the presumption of good-faith action by the government. The party seeking to overcome that presumption "must articulate specific allegations of bad faith and, if necessary, produce reasonably particularized evidence in support of those allegations." Id. at 967. This is "a significant burden," id., and the petitioner has failed to carry it here. We explain briefly.

The petitioner focuses his argument exclusively on the INS's failure to file the OSC with the Immigration Court. By his own account, however, he solicited the OSC a mere thirteen days before the repeal of INA § 244 took effect, and the INS therefore had less than two weeks within which to perfect the filing. The petitioner has identified no regulation or custom that establishes a fixed interval within which an OSC, once served, should be filed. Nor has he presented any probative evidence that the INS promised him it would file the OSC with the Immigration Court within the thirteen-day window. We are not prepared to say, on an otherwise empty record, that the mere passage of thirteen days supports a claim of bad faith. Cf. United States v. Alegria, 192 F.3d 179, 189 (1st Cir.1999) (explaining that carelessness on the part of prosecutors "does not suffice to make out a case of bad faith").

*6 [6] That ends this aspect of the matter. We uphold the BIA's administrative determination that the

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works

2000 WL 1725377
**(Cite as: 2000 WL 1725377, \*6 (1st Cir.))**

Page 6

petitioner was not in deportation proceedings until the NTA was filed with the Immigration Court. See Chevron, 467 U.S. at 837, 104 S.Ct. 2778 (declaring that regulations promulgated by an agency under a statutory scheme within its purview will be given controlling weight unless "arbitrary, capricious, or manifestly contrary to the statute"); Sidell, 225 F.3d at 109 (explaining that an agency's interpretation of its own regulations is entitled to great deference). And since that filing occurred after April 1, 1997, the BIA did not err in ruling that section 244 relief no longer was available.

B.
Equitable Estoppel

[7] The petitioner has a fallback position. He suggests that the INS should be estopped from proceeding under the new rules. In his view, this estoppel arises because (1) the INS should have filed the OSC with the Immigration Court during the thirteen-day interval that elapsed between the issuance of the OSC and the date of the shift in rules, and (2) the service of the OSC created an expectancy on his part that he would be eligible for suspension of deportation. Neither argument is persuasive.

[8][9][10] Asserting an estoppel claim against the government is more easily said than done. The proponent must "demonstrat[e] that the traditional elements of an estoppel are present." Heckler v. Community Health Servs., 467 U.S. 51, 61, 104 S.Ct. 2218, 81 L.Ed.2d 42 (1984). He also must "demonstrate that government agents have been guilty of affirmative misconduct." Dantran, Inc. v. United States Dep't of Labor, 171 F.3d 58, 67 (1st Cir.1999). The upshot is that a private party who presses for an estoppel against the government must establish (1) the occurrence of affirmative government misconduct (2) engendering a reasonable (though erroneous) belief that a certain state of affairs exists (3) upon which the private party relies to his detriment. See Akbarin v. INS, 669 F.2d 839, 842 (1st Cir.1982). Given the rigors of this gauntlet, it is not surprising that estoppel against the government if it exists at all is hen's-teeth rare. OPM v. Richmond, 496 U.S. 414, 422, 110 S.Ct. 2465, 110 L.Ed.2d 387 (1990) (noting that the Justices "have reversed every finding of estoppel [against the government] that [they] have reviewed"); United States v. Ven-Fuel, Inc., 758 F.2d 741, 761 (1st Cir.1985) ("The possibility of harm to a private party inherent in denying equitable estoppel ... is often (if not always) grossly outweighed by the pressing public interest in the enforcement of congressionally mandated public

policy.").

[11][12] The petitioner is unable to overcome these obstacles. First, he cannot meet the "affirmative misconduct" requirement because the INS has done nothing wrong in this case. There is no set time either for initiating a deportation proceeding or for filing a served OSC. Indeed, as we already have remarked, the INS has virtually unfettered discretion in such respects. American-Arab Anti-Discrimination Comm., 525 U.S. at 483-85, 119 S.Ct. 936. Second, the petitioner has made no showing of detrimental reliance; because he had no right to call the tune as to when the INS would commence deportation proceedings against him, he cannot claim reasonable reliance on the import of the OSC (and, at any rate, he did not change his position because of it). [FN7] For these reasons, the petitioner's claim of equitable estoppel lacks force.

III.
Conclusion

**\*7** We need go no further. Because the petitioner has offered us no sound basis for disturbing the BIA's decision, we deny his petition for review.

It is so ordered.

> FN1. The Immigration Court (sometimes called the Office of the Immigration Judge) is an administrative court that operates under the hegemony of the Executive Office of Immigration Review, a unit of the Department of Justice. It functions independently of the INS.

> FN2. Post-IIRIRA, the proper respondent in a petition for judicial review of an order of removal is the Attorney General, not the INS. See 8 U.S.C. § 1252(b)(3)(A). The petitioner, however, flouted this rule and named the INS instead of the Attorney General. Because the error appears harmless, we overlook the discrepancy on this occasion.

> FN3. The type of relief pursued by Wallace is similar, but not identical, to that pursued by Costa. Wallace sought relief under INA § 212(c), which applies to criminal aliens. By contrast, Costa seeks relief under INA § 244, which applies in somewhat different terms to non-criminal aliens. See Cipriano v. INS, 24 F.3d 763, 764 (5th Cir.1994) (limning both forms of relief).

> FN4. We consolidated Wallace's appeal with an appeal taken by an unrelated party, one Lemos, and Judge Boudin wrote a single opinion encompassing both

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works

2000 WL 1725377
**(Cite as: 2000 WL 1725377, *7 (1st Cir.))**

appeals. Because the petitioner's argument derives from the panel's treatment of Wallace rather than Lemos, we limit our account accordingly.

FN5. Two other cases cited by the petitioner, namely, Alanis- Bustamante v. Reno, 201 F.3d 1303 (11th Cir.2000), and Pena-Rosario v. Reno, 83 F.Supp.2d 349 (E.D.N.Y.2000), are cast in the Wallace mold. Both of them lean heavily on the language of the Wallace court. Alanis-Bustamante, 201 F.3d at 1309; Pena-Rosario, 83 F.Supp.2d at 362-63. Moreover, both of them involve the question of whether the enlarged definition of "aggravated felony" contained in AEDPA § 440(d) can constitutionally be applied to criminal convictions antedating AEDPA's effective date. Alanis-Bustamante, 201 F.3d at 1307-08; Pena-Rosario, 83 F.Supp.2d at 363-65. For these reasons, the two cases, like Wallace itself, fail to assist the petitioner here.

FN6. We note in passing that, aside from the two distinctions discussed herein, there are other differences between this case and Wallace. First, the OSC at issue here was served but not filed, whereas the OSC in Wallace was both served and filed. Wallace, 194 F.3d at 282. Second, this case arises under IIRIRA and its permanent rules, and the Wallace court did not purport to deal with that situation. Id. at 288 (cautioning that the decision "applies only to cases governed by IIRIRA's transitional rules; the permanent IIRIRA regime could affect various of the issues discussed and we leave those cases for another day"). Third, Wallace sought relief under INA § 212(c), rather than INA § 244. See supra note 3. We take no view of the significance, if any, of these other distinctions.

FN7. At the expense of carting coals to Newcastle, we add that, in order for there to be detrimental reliance, the aggrieved party must show that he has surrendered a right that he possessed. Heckler, 467 U.S. at 61-62, 104 S.Ct. 2218. Here, however, the petitioner had no right to suspension of deportation. He had, at most, a hope of obtaining discretionary relief. Gonzalez-Torres v. INS, 213 F.3d 899, 903 (5th Cir.2000) ("While petitioners may have expected that they would be eligible for suspension of deportation, IIRIRA's amendment limited only their eligibility for discretionary relief; it did not infringe on a right that they possessed prior to its enactment.") (emphasis in original); Kolster v. INS, 101 F.3d 785, 789 (1st Cir.1996) (similar).

END OF DOCUMENT

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works

2000 WL 675696
**(Cite as: 2000 WL 675696 (E.D.Pa.))**

Only the Westlaw citation is currently available.

United States District Court, E.D. Pennsylvania.

**Salvatore SCIGLITANO, Petitioner,**

v.

**M. FRANCES HOLMES, Acting District Director,
Immigration and Naturalization
Service, Respondent.**

**No. CIV. A. 00-0083.**

May 23, 2000.

MEMORANDUM-ORDER

GREEN.

*1 Presently before the court is the Petition For Writ of Habeas Corpus of Petitioner, Respondent's Response, and Petitioner's Reply Brief. For the reasons set forth below, Petitioner's petition will be granted in part. [FN1]

> FN1. Petitioner's writ of habeas corpus will be granted to the extent that he seeks to enjoin his deportation pending further administrative and judicial reveiw.

I. BACKGROUND

In 1972, the Petitioner, a native and citizen of Italy, lawfully entered the United States at the age of twenty-two. Petitioner adjusted his status to permanent resident in April 1986. On September 25, 1995, Petitioner was convicted in the Northern District of New York of conspiracy to distribute cocaine, in violation of 21 U.S.C. § 846 (1995). He was sentenced to sixty- three (63) months imprisonment.

On November 29, 1995, while Petitioner was still incarcerated, the Immigration and Naturalization Service ("INS") issued and served an Order to Show Cause on Petitioner, and charged that he was deportable under the Immigration & Nationality Act of 1952, as amended ("INA"), 8 U.S.C. § 1101 et seq., as one convicted of an aggravated felony. The INS, however, never filed the Order to Show Cause with the Immigration Court. The government now contends that Petitioner's deportation proceedings did not commence with the issuance and service of the Order to Show Cause in 1995 because under the administrative rule promulgated by the Attorney General, the filing of the

Order to Show Cause with the Immigration Court is a prerequisite for the commencement of deportation proceedings. See 8 C.F.R. § 3.14 (1999). [FN2]

> FN2. In 1995, the regulation provided: "Every proceeding to determine the deportability of an alien in the United States, ... is commenced by the filing of an order to show cause with the Office of the Immigration Judge." 8 C.F.R. 242.1(1995) (repealed).

Thereafter, on May 4, 1996, the INS issued a warrant of detainer notifying the prison officials that Petitioner was to be turned over to the INS after his period of incarceration ended. While Petitioner remained incarcerated in the Allenwood prison complex, Congress amended the INA with the passage of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub.L. No. 104-132, 110 Stat. 1214 (1996) (enacted and effective April 24, 1996) and the Illegal Immigrant Removal and Immigrant Responsibility Act ("IIRIRA"), Pub.L. No. 104-208, Div. c., 110 Stat. 30009-546 (enacted on September 30, 1996 and effective on April 1, 1997). Section 440(d) of the AEDPA eliminated a waiver of deportation (under § 212(c) of the INA) for aliens like the Petitioner who were deportable as aggravated felons while section 309(c)(2) of the IIRIRA authorized the Attorney General to proceed under the IIRIRA in any deportation case in which no evidentiary hearing had been held prior to April 1, 1997.

On February 1, 1999, an INS officer assigned to the Allenwood prison complex issued a "Notice to Appear" ("NTA") to Petitioner alleging that he was deportable based on his conviction. [FN3] The NTA was then filed with the Immigration Court on February 17, 1999. Removal proceedings were held on May 11, 1999, before an Immigration Judge who ordered the Petitioner deported after finding him statutorily ineligible for any type of relief (i.e., waivers and judicial review). The Immigration Judge ruled that Petitioner's case did not commence until February 17, 1999, when the NTA was filed with the Immigration Court because the Order to Show Cause issued and served in 1995 was never filed with the Immigration Court. The Board of Immigration Appeals denied Petitioner's appeal on November 26, 1999 and affirmed the Immigration Judge's ruling that Petitioner's case was not pending as of the effective date of the AEDPA, April 24, 1996.

> FN3. The Notice To Appear is the new charging document (replacing the Order to Show Cause) in what is now termed "removal" (deportation) proceedings

2000 WL 675696
**(Cite as: 2000 WL 675696, \*1 (E.D.Pa.))**

pursuant to 8 C.F.R. § 239.1 (1998).

**\*2** Petitioner filed the instant petition for a writ of habeas corpus, claiming that because the INS issued and served an Order to Show Cause in 1995, his deportation case was pending as of the effective date of the AEDPA. As such, Petitioner avers that Respondent's application of the AEDPA § 440(d) is retroactive in violation of substantive due process under the Fifth Amendment to the United States Constitution. Respondent contends that under the pertinent regulation, a deportation/removal case is initiated when the Order to Show Cause/NTA is filed with the Immigration Court. Since Petitioner's NTA was not filed with the Immigration Court until February 1999, the Respondent argues that Petitioner's proceedings did not commence until that date.

## II. DISCUSSION

All parties agree that the precise issue before the court is whether Petitioner's case was pending before or as of the effective date of the AEDPA, April 24, 1996. If so, Sandoval v. Reno, 166 F.3d 225 (3d Cir.1999), makes relief under section 212(c) potentially available to the Petitioner. If not pending, Petitioner is precluded from judicial review of his removal order. See AEDPA § 440(a) ("Any final order of deportation against an alien who is deportable by reason of having committed [certain drug-related] criminal offense[s] ..., shall not be subject to review by any court.")

Waivers of deportation under section 212(c) of the INA were previously available at the discretion of the Attorney General for aliens who meet certain qualifications including seven years of residency in the United States. See Sandoval, 166 F.3d at 228 (outlining the requirements for section 212(c) relief). However in 1996, Congress with the passage of the AEDPA and IIRIRA (amendments to the INA) limited the Attorney General's authority to waive deportation for certain felonies and curtailed judicial review, especially for this same class of felons. See Sandoval, 166 F.3d at 228-33; Wallace v. Reno, 194 F.3d 279, 281 (1st Cir.1999); Canela, 64 F.Supp.2d at 457. Under the new INA, as amended by section 440(d) of the AEDPA, section 212(c) waivers could not be granted to an alien convicted of certain felony drug offenses. See AEDPA § 440(d). In Sandoval, the United States Court of Appeals for the Third Circuit held that 212(c) relief is still available to those aliens whose cases were "pending" as of the date of the enactment of the AEDPA, April 24, 1996. See

Sandoval, 166 F.3d at 229,242. Thus, as previously stated, the issue turns on whether Petitioner's case was pending as of April 24, 1996.

In the Government's Response to the Petition for Writ of Habeas Corpus, the Respondent argues that removal proceedings did not commence until February 17, 1999, when the INS filed the NTA with the Immigration Court. Since the INA does not define when a deportation case commences, Respondent relies on 8 C.F.R. § 239.1(a) in support of its argument. Section 239.1 provides that: "Every removal proceeding conducted under ... [the INA] to determine the deportability or inadmissibility of an alien is commenced by the filing of a notice to appear with the Immigration Court." 8 C.F.R. § 239.1(a). Respondent further avers that the regulation was effected to address the administrative backlog of cases before the Immigration Court and was not designed to either benefit or encumber a deportable alien.

**\*3** Moreover, Respondent argues that the Attorney General's regulation is entitled to deference under Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Respondent contends that because the INA is silent as to the date on which a deportation case commences, the court must defer to the INS's regulation if it is based on a permissible construction of the statute. See id. at 843. The Third Circuit, however, in Sandoval states that "Chevron appears to speak to statutory interpretation in those instances were Congress delegated rule-making power to an agency and thereby sought to rely on agency expertise in the formulation of substantive policy." Sandoval, 166 F.3d at 225. Since the date at which the regulation considers a case to have commenced is essentially random, the date of commencement does not implicate agency expertise in a meaningful way. See Canela, 64 F.Supp.2d at 458. Accordingly, Chevron deference is not required in the instant matter when "such weighty substantive results flow from an essentially clerical regulation ..." Id.

The Respondent further relies on certain cases which in different factual contexts simply refer to the regulation without any substantive analysis. See e.g. Howell v. Imm. & Natz. Svc., 72 F.3d 288, 290 (2d Cir.1995); Dokic v. Imm. & Natz. Svc., 899 F.2d 530, 531-32 (6th Cir.1990); Mansoori v. Imm. & Natz. Svc., 32 F.3d 1020, 1023 (7th Cir.1999). These cases neither address the issue at bar nor interpret the pertinent regulation.

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works

Petitioner, on the other hand, relies on a line of cases that are factually similar to the instant case. See Wallace v. Reno, 194 F.3d 279, 281 (1st Cir.1999), Alanis Bustamante v. Reno, 201 F.3d 1303 (11th Cir.2000); Canela v. U.S. Department of Justice, 64 F.Supp.2d 456 (E.D.Pa.1999); Mercado-Amador v. Reno, 47 F.Supp.2d 1219 (D.Or.1999). I find these cases more persuasive. As the First Circuit makes clear in Wallace:

"In this case we are not concerned with INS's internal time tables, starting points, due dates and the like but with the judicial questions of retroactivity. The question turns on considerations unrelated to the purpose of INS r egulations--primarily (in the absence of statutory guidance) with the evil congress sought to prevent and the realities of reasonable reliance or settled expectations on the parts of litigants. From this standpoint, we think that when an order to show cause is served on the alien, the deportation process has effectively begun ..." Wallace, 194 F.3d at 287.

I conclude that once the INS issued and served the Order to Show Cause, Petitioner's case was constructively pending. To find otherwise would preclude the Petitioner from applying for 212(c) relief because of the INS's administrative failure to file the Order to Show Cause.

In its brief, Respondent argues that there are reasons other than negligence or inattention to duty, as discussed in Judge Katz's decision in Canella, to account for the failure to file the Order to Show Cause. See Canella 64 F.Supp.2d at 458. That is, Respondent contends that it has "no reason" to file the charging documents of aliens with the Immigration Court so long as voluntary departure remains a possibility. According to the INS, voluntary departure of the alien only remains an available option until the charging document is filed with the Immigration Court. Once the document is filed, the Immigration Court must conduct deportation proceedings. The INS avers that it has no power, without court authority, to cancel or withdraw the charging document after filing. [FN4] I am not persuaded by the government's argument. Even under this theory, the Order to Show Cause provides legally significant notice to the alien that voluntary departure is a possible alternative to deportation proceedings, and indeed supports the conclusion that the notice

commences proceedings.

FN4. In the instant case, the Order to Show Cause and the warrant of detainer were issued and served while the Petitioner was incarcerated. It is not clear from the record whether the Petitioner ever had the ability to exercise the option of voluntarily departing the United States.

*4 I hold that for the purposes of determining whether Petitioner is entitled to apply for relief under section 212(c) his case was pending as of the date of the enactment of the AEDPA. Consequently, the Immigration Judge and the Bureau of Immigration Appeals should have considered the merits of Petitioner's application under 212(c). Therefore, I need not reach the question of whether the Respondent's application of the AEDPA § 440(d) violates substantive due process.

III. CONCLUSION

With the serving of the Order to Show Cause in 1995 on the Petitioner, the INS constructively commenced his deportation proceedings. As such, Petitioner's case was pending as of 1995. Since the 1996 amendments of the INA do not apply retroactively, Petitioner's application for relief under section 212(c) must be considered on its merits.

An appropriate order follows.

ORDER

AND NOW, this ___ day of May 2000, upon consideration of the Petition For Writ of Habeas Corpus of Petitioner, Respondent's Response, and Petitioner's Reply Brief, IT IS HEREBY ORDERED that:

1. Petitioner's writ of habeas corpus is GRANTED in part;

2. Respondent is directed to reopen Petitioner's case and consider Petitioner's claim for 212(c) relief on the merits.

3. Respondent is enjoined from deporting petitioner, if at all, until after the Petitioner is provided the opportunity to exhaust the available administrative and judicial appellate process.

END OF DOCUMENT