# UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| MENACHEM PRI-HAR,<br>Petitioner, | x<br>x<br>x |
| -vs- | x<br>x    Action No. 1: CV-00-1635 |
| JANET RENO, Attorney<br>General of the United States, and<br>Charles W. Zemski, Acting<br>District Director,<br>Respondents. | x<br>x    (Judge William W. Caldwell)<br>x<br>x<br>x<br>x |

FILED
JUL 26 2004
PER
HARRISBURG, PA.    DEPUTY CLERK

## PETITIONER'S SECOND MOTION FOR A JUDGMENT
## DIRECTING SPECIFIC ACTS

Petitioner, Menachem Pri-Har (hereinafter "Petitioner"), acting *pro se*, respectfully

moves this Court for a judgment pursuant to Rule 70, Fed. R. Civ. P., by which an impartial

suitable person executes the Order filed in this case on June 5, 2001.

## FACTUAL BACKGROUND

The Immigration and Naturalization Service then, now re-named with acronym  ICE (but

referred hereinafter as "INS"), had issued against Petitioner a final administrative removal order

hinged on his conviction.  Following Petitioner's challenges on the removal order, the Court

ordered that "the INS shall entertain a request by Petitioner for a waiver of ineligibility or

admission under 8 U.S.C. §1182 (h), INA § 212 (h)."  (Order, filed on June 5, 2001).  The Court

further agreed not to impose a deadline in seeking the waiver.  (See Order, filed on July 5, 2001).

On July 21, 2003, Petitioner forwarded an affidavit, as an application for §212 (h)

waiver, to the INS director and the acting United States Attorney in the district.  Following futile

correspondence with AUSA Daryl L. Bloom, Petitioner filed "motion for a judgment directing specific acts" on December 4, 2003.

The Court denied this motion, stating that "[s]ince there is no evidence that Respondents have not, or refused, to entertain a properly filed request for waiver of removal under §212 (h) as directed in our earlier order . . . , we will deny the Rule 70 motion." (The Memorandum and Order is attached herewith as Exhibit "1").

With certified mail service, on February 5, 2004, Petitioner forwarded his request for 212 (h) waiver on Form I-601 accompanied with the $195 filing fee. (A copy of the application is attached herewith as Exhibit "2"; and a copy of receipt for the $195 check is attached herewith as Exhibit "3"). The United States Postal Service confirmed delivery to the INS on February 10, 2004. (The confirmation receipt is attached herewith as Exhibit "4").

The INS had not acknowledged the receiving of the application. Therefore, during April - June 2004, Petitioner requested the INS' confirmation on the receiving of the 212 (h) application and information on the status of its process. (The letters to the INS dated April 5, May 19 and June 15, 2004, are attached herewith as Exhibit "5"). The INS has not responded to these letters.

Petitioner is scheduled to release from the Government prison on June 20, 2005. Under the terms of 18 U.S.C. §3624(c), he is eligible to serve the terminous six months of his sentence in non-prison's conditions, of which the Federal Bureau of Prisons usually grant if there is no pending removal order of the INS.

2

## REASONS TO GRANT THIS MOTION

Since February 10, 2004, the INS has the application for 212 (h) waiver written on its Form I-601 and the $195 filing fee. Despite three requests, the agency has not acknowledged the receiving of the application or its assent to evaluate Petitioner's request for the waiver.

The period of almost six months in which the INS is muted on the application could reasonably serve as evidence that "Respondents have not, or refused, to entertain a properly filed request for waiver of removal under §212 (h)[.]" (Ex. 1 at 5). Therefore, the remedy of Rule 70 should be employed here by having the Court itself or an impartial suitable person assess the 212 (h) application.

## CONCLUSION

In order not to eviscerate the Order filed in this action on June 5, 2001, the remedy of Rule 70 should be exercised.

The foregoing facts are hereby affirmed under penalty of perjury pursuant to 28 U.S.C. §1746.

Dated: McRae, Georgia
July 21, 2004

Respectfully submitted,

MENACHEM PRI-HAR, *pro se*
#34446-054
McRae C. F.
1000 Jim Hammock Dr.
McRae, GA 31055

3



IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

MENACHEM PRI-HAR,                    :
                                     :
            Petitioner               :
                                     :    CIVIL NO. 1:CV-00-1635
                                     :
      vs.                            :    (Judge Caldwell)
                                     :
JANET RENO, Attorney General         :
of the United States,                :
CHARLES W. ZEMSKI, Acting            :
District Director,                   :
                                     :        **FILED**
      Respondents.                   :    HARRISBURG, PA

                                          DEC 1 1 2003

            *MEMORANDUM*              MARY E. D'ANDREA, CLERK
                                     Per_____
                                              Deputy Clerk

*I.*      *Introduction.*

      Pursuant to Fed. R. Civ. P. 70, the pro se petitioner,

Menachem Pri-Har, has filed a "Motion for a Judgment Directing

Specific Acts," requesting that the court, or in the alternative,

some impartial third party, decide his request for a § 212(h)

waiver.


*II.*     *Background.*

      On June 5, 2001, this court addressed Pri-Har's

petition under 28 U.S.C. § 2241, which challenged a final order of

removal based on his fraud conviction in federal court.  We

rejected Pri-Har's claim that the INS should have considered his

request for a waiver of deportation under now-repealed INA §

212(c)[1].  However, we agreed with him that the INS should consider his request for discretionary waiver of removal under INA § 212(h).[2]  In our order, we directed the INS to "entertain a request by Petitioner for a waiver of ineligibility or admission under 8 U.S.C. § 1182(h), INA § 212(h)."  (*See* Doc. 15).

Pri-Har contends the INS, and now ICE, has failed to comply with this directive by not deciding his waiver application and hence under Rule 70 the court or some other person we designate should make the decision.  In support, Petitioner relies on correspondence he has had with the Assistant United States Attorney (AUSA), Daryl F. Bloom, who represented Respondents in

---

[1]  On September 30, 1996, Congress passed the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA"), Pub.L.No. 104-208, 110 Stat. 3009, which took effect on April 1, 1997.  Section 304(b) of IIRIRA repealed INA § 212(c), and replaced it with § 240A, which is codified at 8 U.S.C. § 1229b. *Perez v. Elwood*, 294 F.3d 552, 557 (3d Cir. 2002).

[2]  In relevant part, INA § 212(h) provides:

> *No waiver shall be granted* under this subsection in the case of an alien who has previously been admitted to the United States as an *alien lawfully admitted for permanent residence* if either since the date of such admission the alien has been *convicted of an aggravated felony* or the alien has not lawfully resided continuously in the United States for a period of not less than 7 years immediately preceding the date of initiation of proceedings to remove the alien from the United States.

*See* 8 U.S.C. § 1182(h)(emphasis added).

-2-

the habeas petition, which indicates to him that the agency is refusing to consider his 212(h) request.

On July 21, 2003, some two years after our order, Pri-Har wrote letters to the INS district director and the Acting United States Attorney, enclosing an "affidavit" and "four (4) exhibits" meant to be his 212(h) waiver application. On July 28, 2003, noting the passage of two years, AUSA Bloom responded, advising Petitioner "that in order to apply for a waiver of inadmissibility under INA § 212(h), you are required to file a Form I-601 application. In addition, you are required to pay the filing fee. The application should be filed in the immigration court having jurisdiction over your case." (Doc. 15, ex. D).

There followed additional correspondence in which Pri-Har opined that: (1) his experience with the INS indicated that any request from him for the proper form or filing it pro se would leave it "mired in a morass of bureaucracy"; (2) "prudent compliance with Judge Caldwell's Order in the above-referenced action invite your subservient (sic), as a liaison between the INS and myself, by furnishing me with the required form and assuring that the INS will act on the application promptly; and (3) the immigration court would not entertain his application because he had been subject to removal proceedings under INA § 238(b) and that the court had directed its order to the district director as a respondent, thereby making the Philadelphia INS office the

-3-

proper jurisdiction. (Doc. 15, ex. D, Pri-Har letter of August 4, 2003).

AUSA Bloom replied that his response "was meant to provide an instruction on how and where to file" the § 212(h) application and "did not make a determination concerning [Petitioner's] eligibility for such relief." (Doc. 15, Exhibit D, Bloom letter of September 29, 2003). AUSA Bloom also noted that although he had not reviewed Pri-Har's file, if Pri-Har was correct in stating he was placed in administrative removal proceedings pursuant to § 238(b) of the INA, he would be statutorily ineligible for relief under § 212(h).

In turn, Pri-Har acknowledged but disagreed with Bloom's "view" that the INS is not required to entertain his request for § 212(h) relief because he is "statutorily ineligible" for that relief. Pri-Har closed the exchange of letters by indicating that "if the INS will not initiate a § 212(h) proceeding within 30 days from the date of this letter, I will move with appropriate action to remedy its flouting on the orders of Judge Caldwell." (Doc. 15, ex. D, Pri-Har letter of October 21, 2003).

III.    *Discussion.*

In pertinent part, Rule 70 provides:

-4-

> If a judgment directs a party to execute a
> conveyance of land or to deliver deeds or
> other documents *or to perform any other
> specific act* and the party fails to comply
> within the time specified, *the court may
> direct the act to be done* at the cost of
> the disobedient party *by some other person
> appointed by the court* and the act when so
> done has like effect as if done by the
> party.

*See* Fed. R. Civ. P. 70 (emphasis added).

Rule 70 cannot assist Petitioner here. The Rule "is designed 'to deal with parties who seek to thwart judgments by refusals to comply with orders to perform specific acts.'" *United States v. One (1) Douglas A-26B Aircraft*, 662 F.2d 1372, 1374 (11th Cir. 1981) (quoting 12 C. Wright & A. Miller, Federal Practice & Procedure, Civil § 3021 (1973)).

Our order did not require the agency to consider the 212(h) waiver application outside the normal process. It also did not require AUSA Bloom to assist Petitioner in any way. It merely required the agency to consider Petitioner's application, which, absent any specific instructions in the order, should have been understood to mean an application filed through the routine procedures.

Since there is no evidence that Respondents have *not,* or *refused,* to entertain a *properly filed* request for waiver of removal under § 212(h) as directed in our earlier order (indeed,

AUSA Bloom advised Petitioner how to file the application), we will deny the Rule 70 motion.

We will issue an appropriate order.


                                    /s/William W. Caldwell
                                   William W. Caldwell
                                   United States District Judge

Date: December 11, 2003

UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

MENACHEM PRI-HAR,                    :
                                     :
        Petitioner                   :
                                     :    CIVIL NO. 1:CV-00-1635
                                     :
        vs.                          :    (Judge Caldwell)
                                     :
JANET RENO, Attorney General         :
of the United States,                :
CHARLES W. ZEMSKI, Acting            :
District Director,                   :
                                     :
        Respondents.                 :

*O R D E R*

AND NOW, this 11th day of December, 2003, upon consideration of Petitioners Motion for a Judgment Directing Specific Acts, it is ordered that the Motion (doc. 15) is denied.


                                 /s/William W. Caldwell
                                William W. Caldwell
                                United States District Judge


                                    **FILED**
                                 HARRISBURG, PA

                                 DEC 1 1 2003

                            MARY E. D'ANDREA, CLERK
                            Per_____
                                    Deputy Clerk

**MENACHEM PRI-HAR**
**# 34446-054**
**McRae C.F.**
**1000 Jim Hammock Dr.**
**McRae, GA  31055**

January 27, 2004

Department of Homeland Security
Bureau of Citizenship and Immigration Service        Certified Mail_____
26 Federal Plaza                                     Return Receipt Requested
New York, New York  10278

RE:  Application for INA §212(h) waiver

Dear Sir / Madam:

    Enclosed please find an executed Form I-601 accompanying with affidavit and its four (4) exhibits for your consideration.  I also enclosed herewith the prescribed fee of $195.

    Please note that the referenced application is submitted pursuant to Orders of the United States District Court in the case *Pri-Har v. Reno et al., No. CV-00-1635 (M.D. Pa)* filed on June 5 and July 5, 2001 (appearing as Exhibit 1 to the affidavit). Also, prior to my incarceration I resided in the city of New York during my visits in the United States.  Therefore, I believe that your office has jurisdiction over the instant application.

    Thank you for your attention to this matter.

Very truly yours,

MENACHEM PRI-HAR

Enclosures

U.S. Department of Justice
Immigration and Naturalization Service

Application for Waiver of Grounds of Excludability

OMB No. 1115-0048

## DO NOT WRITE IN THIS BLOCK

| | |
|---|---|
| ☐ 212 (a) (1) | ☐ 212 (a) (10) |
| ☐ 212 (a) (3) | ☐ 212 (a) (12) |
| ☐ 212 (a) (6) | ☐ 212 (a) (19) |
| ☐ 212 (a) (9) | ☐ 212 (a) (23) |

Fee Stamp

### A. Information about applicant -

1. Family Name (Surname in CAPS)    (First)    (Middle)
PRI-HAR    MENACHEM

2. Address (Number and Street)    (Apartment Number)
C/O McRAE C.F., 1000 JIM HAMMOCK DR.

3. (Town or City)    (State/Country)    (ZIP/Postal Code)
McRAE    GEORGIA    31055

4. Date of Birth (Month/Day/Year)    5. I&N File Number
06 | 10 | 1954    A-77627738

6. City of Birth    7. Country of Birth
HAIFA    ISRAEL

8. Date of visa application    9. Visa applied for at:
TEL-AVIV

10. Applicant was declared inadmissible to the United States for the following reasons: (List acts, convictions, or physical or mental conditions. If applicant has active or suspected tuberculosis, the reverse of this page must be fully completed.)

SEE DETAILS IN THE
ENCLOSED AFFIDAVIT IN
SUPPORT OF INA. 212(h)
WAIVER.

11. Applicant was previously in the United States, as follows:
City & State    From (Date)    To (Date)    I&NS Status

SEE DETAILS IN THE
ENCLOSED AFFIDAVIT IN
SUPPORT OF AN I.N.A.
212(h) WAIVER.

12. Social Security Number
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

### B. Information about relative, through whom applicant claims eligibility for a waiver -

1. Family Name (Surname in CAPS)    (First)    (Middle)
PRI-HAR    DROR    BREAST

2. Address (Number and Street)    (Apartment Number)
36 ARBOUR STREET

3. (Town or City)    (State/Country)    (ZIP/Postal Code)
WEST ISLIP    NY    11795

4. Relationship to applicant    5. I&NS Status
SON    CITIZEN

### C. Information about applicant's other relatives in the U.S.
(List only U.S. citizens and permanent residents)

1. Family Name (Surname in CAPS)    (First)    (Middle)

2. Address (Number and Street)    (Apartment Number)

3. (Town or City)    (State/Country)    (ZIP/Postal Code)

4. Relationship to applicant    5. I&NS Status

1. Family Name (Surname in CAPS)    (First)    (Middle)

2. Address (Number and Street)    (Apartment Number)

3. (Town or City)    (State/Country)    (ZIP/Postal Code)

4. Relationship to applicant    5. I&NS Status

1. Family Name (Surname in CAPS)    (First)    (Middle)

2. Address (Number and Street)    (Apartment Number)

3. (Town or City)    (State/Country)    (ZIP/Postal Code)

4. Relationship to applicant    5. I&NS Status

Signature (of applicant or petitioning relative)

Relationship to applicant    Date    JAN-15-2004

Signature (of person preparing application, if not the applicant or petitioning relative) I declare that this document was prepared by me at the request of the applicant, or petitioning relative, and is based on all information of which I have any knowledge.

Signature

Address    Date

| | | Relocated | | Completed | | |
|---|---|---|---|---|---|---|
| Initial receipt | Resubmitted | Received | Sent | Approved | Denied | Returned |
| | | | | | | |

Form I-601 (Rev. 04-11-91) Y
Page 1



```
-------------------------------------------------
In the matter of                    *
                                    *
MENACHEM PRI-HAR,                    *
                    Applicant.      *          File No.: A77627738
                                    *
-------------------------------------------------*
```

## AFFIDAVIT IN SUPPORT FOR A WAIVER
## OF INELIGIBILITY
## OR ADMISSION UNDER INA § 212 (h)

MENACHEM PRI-HAR, being under penalty of perjury in compliance with 28 U.S.C. § 1746, hereby deposes and says:

(1) I am the applicant in the above - referenced case.

(2) I submit this affidavit pursuant to the orders of the United States District Court for the Middle District of Pennsylvania in the case entitled <u>Menachem Pri-Har v. Janet Reno and Charles W. Zemski</u>, Civil Action No. 1: CV-00-1635, which were filed on June 5, and July 5, 2001. (The copy of the orders are attached herewith as Exhibit "1" ).

I.                              <u>**BACKGROUND**</u>

(3) I am a native and citizen of the State of Israel.

(4) Since the end of 1983, numerous times I had been lawfully admitted to the United States under the auspices of a business visa for exporting and importing

agricultural products.  My last entry to the country was on March 27, 1993.

(5)  On March 29, 1993, I was arrested by the Federal Bureau of Investigation. Following a jury trial,  I was convicted on a 24 count indictment charging conspiracy to defraud and wire fraud by way of inaccurate representation to banks and misstatement on application for subsidies to the United States Department of Agriculture.  As a consequence, I was sentenced, *inter alia*, to 14 years of imprisonment.  See <u>Pri-Har v. United States</u>, 83 F. Supp. 2nd 393, 395 - 96 (S.D. N.Y.  2000).

(6)  My conviction and sentence had caused the Immigration and Naturalization Service ("INS") to issue a final administrative removal order, dated August 10, 2000, pursuant to its authority under § 238 (b) of the Immigration and Nationality Act ("INA"). (The final administrative removal order is attached herewith as Exibit "2").

(7)  Following appeal on the removal order, the United States District Court for the Middle District of Pennsylvania (William W. Caldwell, J.), had issued a memorandum and orders for which the INS was directed to entertain my request for a waiver of ineligibility or admission under INA § 212 (h).  (See Ex. 1).

(8)  The INS did not appeal these orders.

## II.        THE LEGAL STANDARD FOR WAIVER UNDER INA § 212 (h)[1]

(9)  The statute formulated a standard by which a deportee must shoulder in order to obtain a §212 (h) waiver.  The terms are :  (a) the alien is the spouse, parent or child of a U.S. citizen or lawful permanent resident;  (b) the deportation would result in extreme hardship to the U.S. citizen or lawful permanent resident spouse, parent or

_____

1.  INA § 212(h) was codified under 8 U.S.C. § 1182 (h).

2

child;  (c) the alien's admission would not be contrary to the national welfare, safety or security of the United States;  and (d) the Attorney General exercises his discretion in the alien's favor.  8 U.S.C. § 1182 (h).  The Attorney General prong does not saddle an alien with the need to "prove that he actually would have been granted such relief."  Instead, " he must make a 'plausible' showing that the facts presented would cause the Attorney General to exercise discretion in his favor."  United States v. Arce-Hernandez, 163 F. 3d 559, 563, (9th Cir. 1998).

## III.        THE FACTS TO WHICH § 212 (h) WAIVER ARE APPLIED

### A.                    *Family Ties to a U.S. Citizen*

(10)  On April 21, 1992, my son Dror  B. Pri-Har (hereinafter "Dror"), was born at the Jewish Hospital in Great Neck, New York.  (A copy of Dror's Certificate of Birth is attached herewith as Exibit "3").

(11)  Since his birth, Dror is rearing in the United States.

(12)  I therefore meet the threshold requirement of § 212 (h), as being a parent of American citizen.

### B.                *A Deportation Would Result in Extreme Hardship*

(13)  "Extreme hardship" defined as when " there is great actual or prospective injury or extreme impact on the citizen family member, beyond the common results of deportation."  Arce - Hernandez, 163 F. 3d at 564 (quotation and citation marks omitted).

(14)  Barbara A. Breest (hereinafter "Barbara") is the mother of Dror.

3

(15)  Barbara and myself were scheduled to be married at the beginning of April 1993, but due to my arrest the wedding ceremony was canceled.

(16)  Until the summer of 1995 Barbara had frequently brought our son, Dror, to visit me at the federal prisons.

(17)  Despite my imprisonment, until the summer of 1995 I provided Barbara and Dror with all of their financial needs.

(18)  The summer of 1995 brought an acute change of Barbara's heart toward me.  Following trips to Los Angeles, California, she decided to relocate her and Dror's residence place from West Islip, New York, into the "Hollywood" city.  In doing so, she has foreclosed visits and communications between Dror and myself.

(19)  Since the summer of 1995, when Dror was just three (3) years old, I have not seen or heard from him.  All my letters and gifts, which were sent to Dror at the address of Barbara's parents, (the only address known to me), have not been answered or acknowledged by him.

(20)  I attempted to cure this bleak situation with a plea to the Supreme Court of the State of New York, (index No. 24785 / 95), but my physical internment in a federal prison had foreclosed intervention by the court.

(21)  The combination of Barbara's unjust acrimony toward me and my impending deportation from the United States will cause Dror's adolescence in a fatherlessness environment.

(22)  During the years of 2001 and 2002, Barbara had send me a few letters indicating her financial strain and requesting to provide her child support.  I agreed to pay *all* of Dror's expenses as long as she allow his contacts with me.  With no

4

explanation, Barbara refused to let relationship between Dror and myself even at the cost of subjecting Dror to indigent conditions of living.

(23)  The dire effects on a child who rearing without a father descibed by Ken Canfield, a Philosophy Doctor, in his book " The Heart Of A Father ".  Dr. Canfield cited injuries of (a) likelihood to commit crimes and engagement in substance abuse; (b) poor schooling; (c) indigent life; and (d) pre-mature sexual activity.  Each of these lurid factors, undoubtedly in anyone's book, is repugnant to the conscience of mankind as to be ranked as fundamental impact on Dror's life.  (The relevant excerts from the book are attached herewith as Exhibit "4").

(24)  I am a pilot who served in the Israeli Air Force, and I have the fiscal means to provide Dror with his mundane needs and affluent conditions of living.

(25)  I believe that Dror will significantly benefit from my cachet traits to his life, and my influence on him will protect him from being subjected to lasting, prospective injuries from the growing without his father.

(26)  A § 212 (h) waiver will permits my access to the Family Court where I be able to obtain, at a minimum, visiting of Dror and providing him with all of his needed financial support.  In doing so, Dror will be saved from extream hardship(s) in his life.[2]

---

2. I assume that no court will agree with Barbara's methods of depriving a son from his father on the basis of her change of heart.

5

**C.**        ***A Waiver of Ineligibility or Admission Under  INA § 212 (h)
Will Not Effect the National Welfare, Safety or Security
of the United States***

(27)  The security tenet of the United States does not view Israeli citizens
as being a threat to its safety nor that my conviction had any effect on the safety or
security of the United States.

(28)  The national welfare of the country can only be benefited from the
granting of § 212 (h) waiver, because I will carry all of Dror's needs and thus
preventing unneccessary cost to the U.S. welfare services on any of his
prospective injuries, which might be occurred if Dror reared in a fatherlessness
home.

(29)  Therefore, my admission to the United States in order to bond
relationship of father and son, whom have not seen or been in touch since
the son was three years old, thanks to his mother unjust vexation, does not
subject the country to any precarious harm.

**D.**        ***The Attorney General Should Side With a § 212 (h) Waiver***

(30)  The only court who has jurisdiction and power to cease Barbara's
conduct of curbing relationship between Dror and me, is the Family Court in
the United States.  The deportation will foreclose my access to this court and
thus Dror may never know his father.

(31)  At issue here is Barbara's conduct of depriving Dror from his father
and subjecting him to rearing in a fatherlessness home.  I believe that such
conduct offends core principle of human race, and thus, the Attorney
General should permit the § 212 (h) waiver in order to stop this evil act and

6

allow me to develope bond with Dror.


Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that to my knowledge the foregoing is true and correct.

Dated:  McRae, Georgia
        July 21, 2003

MENACHEM PRI-HAR
#34446-054
McRae  C.F.
1000 Jim Hammock Drive
McRae, GA  31055

7

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

MENACHEM PRI-HAR,                          :
            Petitioner

                                           :

      vs.                                  :    CIVIL ACTION NO. 1:CV-00-1635

JANET RENO, Attorney General               :
of the United States,
CHARLES W. ZEMSKI,                         :           **FILED**
Acting District Director,                          HARRISBURG. PA
            Respondents                    :
                                                      JUN 0 5 2001

                                                MARY E. D'ANDREA, CLERK
                                                Per _____
                          O R D E R                  Deputy Clerk

        AND NOW, this 5th day of June, 2001, upon consideration

of the habeas corpus petition, filed September 14, 2000, it is

Ordered that:

        1.  The petition is denied except that the
    INS shall entertain a request by Petitioner
    for a waiver of ineligibility or admission
    under 8 U.S.C. § 1182(h), INA § 212(h).

        2.  Petitioner shall file such a request
    within thirty days of the date of this order.
    It shall supersede any other such request
    already made by Petitioner.

        3.  The Clerk of Court shall close this
    file.

                                    _____
                                    William W. Caldwell
                                    United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

MENACHEM PRI-HAR,                      :
      Petitioner

                                    :

      vs.                              :    CIVIL ACTION NO. 1:CV-00-1635

JANET RENO, Attorney General          :
of the United States,
CHARLES W. ZEMSKI,                    :                    **FILED**
Acting District Director,                           **HARRISBURG, PA**
          Respondents                  :
                                        JUL 0 5 2001

                                 MARY E. D'ANDREA, CLERK
           O R D E R           PER_____
                                   DEPUTY CLERK

       AND NOW, this 5th day of July, 2001, upon consideration
of Petitioner's motion (doc. 12) to extend the time to file an
application for a section 212(h) waiver, it is ordered that the
thirty-day deadline is vacated and that Petitioner shall not be
subject to any deadline by this court for seeking such a waiver.


                                                         _____
                                                 William W. Caldwell
                                          United States District Judge

AO 72A
(Rev.8/82)

U. S. Department of Justice
Immigration and Naturalization Service                        **Final Administrative Removal Order**

---

## FINAL ADMINISTRATIVE REMOVAL ORDER
## UNDER SECTION 238(b) OF THE
## IMMIGRATION AND NATIONALITY ACT

BOP NO: 34446-054
FILE NO: A77 627 738
DATE: 8-10-00

To:            PRI-HAR, Menachem
Address:     LSCI ALLENWOOD, Allenwood, PA 17887
                   (Number, street, city, state, and ZIP code)
Telephone:   N/A
                   (area code and phone number)

### ORDER

Based upon the allegations set forth in the Notice of Intent to Issue a Final Administrative Removal Order and evidence contained in the administrative record, I, the undersigned Deciding Service Officer of the Immigration and Naturalization Service, make the following findings of fact and conclusions of law. I find that you are not a citizen or national of the United States and that you were not lawfully admitted for permanent residence. I further find that you have a final conviction of an aggravated felony as defined in section 101(a)(43)(**M&U**) of the Act, 8 U.S.C. 1101(a)(43) and are ineligible for any relief from removal that the Attorney General may grant in an exercise of discretion. I further find that the administrative record established by clear, convincing, and unequivocal evidence that you are deportable as an alien convicted of an aggravated felony pursuant to section 237(a)(2)(A)(iii) of the Act, 8 U.S.C. 1227(a)(2)(A)(iii). By the power and authority vested in the Attorney General and in me as the Attorney General's delegate under the laws of the United States, I find you deportable as charged, and order that you be removed from the United States to

_____**Israel**_____ or to any alternate country prescribed by section 241 of the Act.

_____
(Signature of Authorized INS Official)

District Director
(Title of Official)

Philadelphia, PA          8-10-00
(Date and office location)

Petition for review:  [  ] Waived by respondent
                              [  ] Reserved by respondent

---

### Certificate of Service

I served this **FINAL ADMINISTRATIVE REMOVAL ORDER** upon the above-named individual.   P.O. Box 1000

8/16/00     ALLENWOOD, PA.          MAIL SERVICE    White Deer, PA 17887
(Date, time, place and manner of service)

_____
(Signature and title of officer)

Form I-851A(Rev 4-1-97)N

**Attachment to Final Administrative Removal Order (I-851A)**

**RE: Menachem PRI-HAR, A77 627 738**

I have considered all the information related to the Administrative Removal proceedings in your case. You have submitted a written response to the Notice of Intent to Issue a Final Administrative Removal Order on July 29, 1999. Your were granted a final 30 days extension in order to submit your response. This extension expired on June 24, 2000. Your request for another extension to submit a response is denied.

I find that your alienage, conviction of an aggravated felony, and deportability are supported by clear convincing and unequivocal evidence. I also find that you are not a lawful permanent resident of the United States.

You have requested that you be allowed to pursue a waiver of inadmissibility under section 212(c) of the INA. However, you are statutorily ineligible for such relief. Section 212(c) of the INA was repealed by section 304(b) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. 104-207, 110 Stat. 3009 (effective April 1, 1997)(hereinafter "IIRIRA). This amendment to the INA applies to individuals placed in proceedings after April 1, 1997, the effective date of IIRIRA. Inasmuch as the instant proceedings were commenced against you on May 11, 2000, you are precluded from applying for relief under former section 212(c) of the INA as a matter of law.

Therefore, the decision on the Administrative Removal Order is final.



DOCUMENT NO.

# THE CITY OF NEW YORK

## DEPARTMENT OF HEALTH
### VITAL RECORDS

# CERTIFICATION OF BIRTH

This is a certification of name and birth facts on file in the Bureau of Vital Records, Department of Health, City of New York.

| | |
|---|---|
| DATE OF BIRTH | APRIL 21, 1992 |
| BOROUGH | QUEENS |
| NAME | DROR BREEST FRI-HAR |
| SEX | MALE |
| MOTHER'S MAIDEN NAME | BARBARA ANN BREEST |
| FATHER'S NAME | MENACHEM FRI-HAR |

| CERTIFICATE NO. | DATE FILED | DATE ISSUED |
|---|---|---|
| 156-92-030931 | 04-24-92 *** | 10-02-95 |

*Earlene Price*

EARLENE PRICE
CITY REGISTRAR



Do not accept this transcript unless it bears the raised seal of the Department of Health. The reproduction or alteration of this certification is prohibited...

# THE HEART OF A FATHER

*How Dads Can*

*Shape the*

*Destiny of America*

KEN CANFIELD, Ph.D.

NORTHFIELD PUBLISHING
CHICAGO

In the quiet hours of the night, when I add up the accomplishments of my life in which I take justifiable pride—a dozen books, thousands of lectures and seminars, a farm built by hand, a prize here, an honor there—I know that that rank above all the others are named Lael, Gifford, and Jessamyn [his children]. In the degree to which I have loved, nurtured, and enjoyed them, I honor myself. In the degree to which I have injured them by being unavailable to them because of my obsessive preoccupation with myself or my profession, I have failed as a father and as a man.[3]

## Migration of Fatherhood

For many dads, though, their father power has dwindled. Many have diminished or even lost their roles as influential fathers, some by choice. The number of children who live with their biological father has dropped from 82.4 percent in 1960 to 61.7 percent in 1990. But even this figure does not get at the extent of the decay. It is estimated that, with the explosion of out-of-wedlock births and the

level of divorces—in which the mother typically gains physical custody of the children—up to 60 percent of today's children will spend at least part of their childhood living apart from their biological father.[5] But there is more than one way for a father to be absent from his family. Being fatherless does not just mean losing a father through death, divorce, or illegitimate birth. In a 1994 survey of more than 500 adult men, more than 50 percent said their fathers were emotionally absent for them growing up.[6] That may help explain why in another survey only 34 percent of adult males could say that they considered their own father to be a role model.[7]

Ward and June Cleaver and their ideal neighborhood of the fifties may be a nostalgic relic. Dramatic changes in lifestyle and culture have revolutionized the structure of the traditional American family, leaving to one expert, more than 40 percent of American adults have weekly contact with children.[8]

In my span of a few weeks, as I was speaking in New York City and southern California, I again came face-to-face with the life stories behind the statistics. Only a few of the men I met were still married, living with their children's mother. One man told me a typical story: his wife had left him and moved with their three children to Sacramento. He has since remarried a woman who has three children of her own. "I feel like I'm fathering my stepchildren but not my own children."

Many of them commute an hour or more every day to work. Some leave at 5:00 or 5:30 in the morning, and often don't get home until 7:30, just in time to watch their children go to bed.

Certainly financial pressures have contributed to the decline in fathering. Those financial pressures cause some men to work longer and harder for hopes of advancement and pay raises. A rise in additions and sexual irresponsibility are also factors. Yet, I believe there to be deeper reasons for disintegrating fatherhood:

- A loss of vision for the future. For years, our society was focused on our posterity, but no longer. For many adults, happiness has become the all-consuming goal. That's putting our personal preferences ahead of our children's needs.

- A loss of priorities. Men especially are prone to finding their identity through their work rather than their family, and they confuse achievement, salary, and title with being better as a person.

- A loss of sense of duty and commitment. Sacrifice is no longer applauded—who does what is right anymore simply because it is right?

- A loss of community. Individualism has run amok. Involved fatherhood has become a private matter, and fathers rarely communicate with other dads about fathering.

## WHEN FATHERS DISAPPEAR

Henri Nouwen, a parish priest and author, accurately predicted in the seventies that the coming generation would be known by its sense of inwardness, convulsiveness, and fatherlessness.[9] Consider the legacy of the disappearing father. Fatherlessness, either through physical or emotional absence, has had the following effects:

- Fatherless children are more likely to commit crimes and engage in substance abuse. A 1994 report from the Wisconsin Department of Health and Social Services found just 12 percent of the delinquents in state custody were from a two-parent family. A 1980 study of female delinquents in the California Youth Authority found just 7 percent came from intact families.[10]

- On average, fatherless children score lower on tests and have lower grade point averages. Family scholar Barbara Dafoe Whitehead find significant differences in educational attainment between children who grow up in intact families and children who do not.[11]

- Children in father-absent families are five times more likely to be poor and ten times more likely to be extremely poor.[12]

- Adolescents in mother-only families are more likely to be sexually active, and daughters are more likely to become single-parent mothers.[13]

But the poison goes even deeper. "Broken homes contribute to as many as 3 in 4 teen suicides and 4 in 5 psychiatric admissions."[14] The statistics can try to measure the tragedy, yet they can never capture the personal pain of thousands. Such as Cathy. One of Cathy's earliest memories was climbing up into the window seat of her bedroom and waiting for the lights of her father's car to pull into the family's driveway. She remembers both fear and longing, a sort of sick feeling. Fear, because he was loud and drunk and often abusive with her and her mother. Longing, because . . . well, just because he was her daddy. "I remember just wanting to crawl up in my daddy's lap and just be with him," she says. "He never let me do that." Cathy is now thirty-eight and struggles with her own identity and feels worthless.

## REASONS FOR HOPE

We certainly don't intend our children to be among those statistics, individual stories of pain. Yet we may wonder about the culture: Is there any hope for a rebirth of fathering? Will my children be surrounded by apathys?

Despite the overwhelming deterioration around us, I am encouraged about fathering. In a sense, it is both the best of times and the worst of times. Though many children are growing up fatherless, many of us are now making their children a priority in a new way. Phenomena such as the Promise Keepers men's movement and the Million Man March on Washington, both calling on men to accept their duties as fathers, suggest a new sense of commitment to fathering.[15]

A few years ago, Parents magazine asked me to come up with trends affecting fathering. I tried to tell the reporter that fathering itself would be the trend. When she didn't seem to understand, I said plainly, "There will be an increased awareness of the importance of 'fatherhood.'" This recess, I explained, would grow out of the pain of a million neglectful childhoods, and find its voice in counseling sessions and therapy in groups with titles such as "Adult Children of Alcoholics" and ...

to overreact—to blame our fathers for all things. One Newsweek

cover carried the headline "Deadbeat Dads" above a photograph of an unshaven, surly looking man with smudged glasses riding low on his nose.[16] He is one of the images of modern American fatherhood.

From experience I've learned that most of these "deadbeat dads" are little boys in men's bodies, often living in denial and pain after the divorce. The best way to reach them is to help them get in touch with their pain and wait patiently until they have a revelation that being a father is one of the greatest joys a man can experience, and their children are actually a gift which gives them purpose, direction, and hope. As Sam Osterson notes, "Fatherhood is not just a role-provider, disciplinarian, friend—its also a relationship, one that transforms us as much as our kids."[17]

The yearning of many men today to become good fathers is rooted in our past—we are all children who want our fathers. Something in us yearns to honor fatherhood. James Herzog of Harvard University is credited with coining the term "father hunger,"[18] which one of his disciples defines as "a subconscious yearning for an ideal father."

I don't think we necessarily want an "ideal" dad, we just want our dad, and we just want to be a dad to our kids. That's why this book isn't a call to restore the "traditional" family; it's a call to restore your family. Your father was not Ben Cartwright (of Bonanza); your grandfather was not Robert Young (Father Knows Best); and you need not be Tim Taylor (Home Improvement) or Heathcliff Huxtable (The Cosby Show), full of laughs and occasional wisdom, to correctly raise your children. You, your father, and your father's father are all unique men qualified to be fathers to your children.

## THE NEED FOR MODEL DADS

Men do want to be effective fathers, and that's the good news. As fathers, we recognize our powerful influence on our children and want to use it for good. But a key roadblock in recovering our positive power as fathers is that we lack complete and effective models. Historically, men learned to father by following models. They kept their eyes open and watched daily how it was done. Hopefully they were able to do their fathering apprenticeship, studying under their own dads, subconsciously taking notes of who a father is and what a father does.

Today, what can a man deduce about fathering if his primary model walked out on him when he was just a kid? He may say to himself,

suburbs as well as the inner cities.

More often, though, men who had an incomplete model have a sense of the vacuum, and they have a desire to give something better to their children. Dads who are overcomers want to break the unhealthy cycles they've inherited from their fathers. Some do so by overcompensating: "I'm going to be the father I never had," they say. Yet many who make that declaration later admit, "You know, when my first child was born I told myself 'I am going to be the father I never had,' but now I find myself doing the very things I disliked so much in my dad." Our dads are our default models: If we reject them as models but fail to replace them with new ones, then we end up using them as our models anyway, in spite of ourselves.

Unfortunately, much of what is being written by experts, sociologists, and journalists about fathering doesn't help. In addition to "deadbeat dads," other models rise up, such as those from pathology via such writers as Lewis Yablonsky and Robert Meister:[19] abusive dads, buddy dads, assistant dads, critical dads, seductive dads, idealized dads, egocentric dads, psychopathic dads, and more. These types, which are considered vitally important in research, often make you feel like a college freshman in a psychology course: Nothing in the textbook seems to fascinate us as much as the chapters on abnormal behaviors.

But we're not abnormal fathers. We're just typical Joes trying to win our kids. We need a simplified plan for being an effective father—a plan that makes sense and that considers social research.

## DISCOVERING THE JOY OF FATHERING

The heart of the father needs to beat for his children. Ultimately, it's a matter of what a father *does*—although that is important, and we'll research that shows what behaviors help our children. But my driving purpose is for you to discover the immense joy of fathering. I wish for each of us to be more like Bob, a father and friend of mine.

One day at work during an intense meeting, Bob's eyes started fading. "Bob," someone said, "did you hear me?" "Oh sure," Bob said, and his focus snapped back to the person's face. He leaned forward only a few seconds later, in the middle of someone's comment, waved his hand apologetically: "I'm really sorry," he said, "but I just can't concentrate. Hold your thought; I'll be back in a minute." Out the

and re-crossed her legs; Jerry offered to get coffee.

About eight minutes later, Bob shuffled back into the room. "Where were we?" he asked. Everyone looked at him, still perplexed. "OK," he said, "I'm sorry I left, but I couldn't wait. My kids are down at the day care today, and I just had to have a 'kid fix.'"

Dad, I'm warning you: *Fatherhood can be addicting.* Its simple joys can become compelling. Maybe for you it will start with bouts of all-star wrestling when you get home from work, then maybe you'll find yourself sneaking hugs before dinner, or lingering longer than necessary by their beds at night, or uttering words of encouragement when they leave for school. Finally, you'll be looking to score a fix at any moment of the day.

Then, if worse comes to worse, you'll become a pusher. Like me.

In this water, he left bewilderment. Where did he go? the staff won-

4. What was so important that it couldn't wait twenty minutes? And, out a clue, they waited. Betty twiddled her thumbs, Helen crossed

Case 1:00-cv-01635-JWC-PJT Document 17 Filed 06/28/2004 Page 28 of 36

02/04/2004                           *McRae Correctional Facility*
ACCTDEDS                         *Trust Account Deduction Receipt*

Page 1

| | |
|---|---|
| Name: | **Pri-har, Menachem** |
| Facility ID: | **34446054** |
| Location: | |
| Trans. Type: | **M** |
| Check Number : | **3639** |
| Comment: | **Bureau of Citizenship & Immigration Serv - App Fee** |

Scanner ID:**MCA04301**

Deduction Date:  **02/04/2004**

Receipt #:  **379891**

Total Amount of Deduction:          **195.00**

Account 1 - Balance Prior to Deduction:          **273.46**
Account 1 - Amount of Deduction:          **195.00**
Account 1 - Balance After Deduction:          **78.46**

④

See
Sheet Attached

**U.S. Postal Service**
**CERTIFIED MAIL RECEIPT**
(Domestic Mail Only; No Insurance Coverage Provided)

7001 1940 0005 5878 7501

| | | |
|---|---|---|
| M. PRI-HAR #34146005(3 K-01-163 | | |
| Postage | $ | 1.52 |
| Certified Fee | | 2.30 |
| Return Receipt Fee (Endorsement Required) | | 1.75 |
| Restricted Delivery Fee (Endorsement Required) | | |
| Total Postage & Fees | $ | 5.57 |

Postmark Here

MACON GA 31055
FEB 5 2002
USPS

Sent To
DEPT OF HOMELAND SECURITY
Street, Apt. No.; or PO Box No.
26 FEDERAL PLAZA
City, State, ZIP+4
NEW YORK, NY 10278

PS Form 3800, January 2001                    See Reverse for Instructions



| Track/Confirm - Intranet Item Inquiry - Domestic |
| --- |

Item: 7001 1940 0005 5878 7501

| Destination | ZIP Code: 100 | City: | State: |
| --- | --- | --- | --- |
| Origin | ZIP Code: | City: | State: |

| Event | Date | Time | Location | Scanner ID |
| --- | --- | --- | --- | --- |
| DELIVERED | 02/10/2004 | 12:14 | NEW YORK NY 10278 | 00A39C28W |

Firm Name: BCIS 26 FEDERAL PLAZ
Recipient : 'J VANDAMIO'



| ARRIVAL AT UNIT | 02/10/2004 | 08:54 | NEW YORK NY 10007 | K682676 |
| --- | --- | --- | --- | --- |

### Enter Request Type and Item Number:

Quick Search ⊙    Extensive Search ○

Explanation of Quick and Extensive Searches

Item Number:
[          ]  Submit

**Inquire on multiple items.**

**Go to the Product Tracking System Home Page.**

MENACHEM PRI-HAR
# 34446-054
McRae C.F.
1000 Jim Hammock Dr.
McRae, GA 31055

APRIL 5, 2004

DEPARTMENT OF HOMELAND SECURITY

BUREAU OF CITIZENSHIP AND IMMIGRATION SERVICE

26 FEDERAL PLAZA

NEW YORK, NEW YORK 10278

RE: APPLICATION FOR A INA §212(h) WAIVER

FILE No. A77 627 738

DEAR SIR/MADAM:

On FEBRUARY 10, 2004, YOU RECEIVED MY APPLICATION IN THE ABOVE-REFERENCED MATTER ACCOMPANIED WITH $195 FILING FEE. AS OF TODAY, HOWEVER, I HAVE NOT RECEIVED YOUR ACKNOWLEDGEMENT ON THE APPLICATION. I THEREFORE REQUESTS YOUR CONFIRMATION FOR RECEIVING THE APPLICATION AND WHETHER IT HAS BEEN PLACED UNDER CONSIDERATION.

THANK YOU.

VERY TRULY YOURS,

MENACHEM PRI-HAR

MENACHEM PRI-HAR
# 34446-054
McRAE C.F
1000 Jim Hammock DR.
McRAE, GA 31055

MAY 19, 2004

DEPARTMENT OF HOMELAND SECURITY

BUREAU OF CITIZENSHIP AND IMMIGRATION SERVICE

26 FEDERAL PLAZA

NEW YORK, NEW YORK 10278

RE: APPLICATION FOR INA §212(h) WAIVER
FILE No. A77 627 738

DEAR SIR/MADAM:

On FEBRUARY 10, 2004, YOUR OFFICE RECEIVED MY APPLICATION ACCOMPANIED WITH $195 FILING FEE IN THE ABOVE-REFERENCED MATTER. AS OF TODAY, HOWEVER, NO ACKNOWLEDGEMENT HAS BEEN ISSUED. PLEASE CONFIRM THE RECEIVING OF THE APPLICATION AND INFORM ON THE STATUS OF YOUR CONSIDERATION.

THANK YOU.

VERY TRULY YOURS,

MENACHEM PRI-HAR

MENACHEM PRI-HAR
#34446-054
McRae  C.F.
1000 Jim Hammock Dr.
McRae, GA 31055

JUNE 15, 2004

DEPT. OF HOMELAND SECURITY

BUREAU OF CITIZENSHIP AND IMMIGRATION SERVICE

26 FEDERAL PLAZA

NEW YORK, NEW YORK 10278

RE: APPLICATION FOR INA §212(h) WAIVER

FILE No. A77 627 738

DEAR SIR/MADAM:

    IN THE ABOVE-REFERENCED APPLICATION, THIS IS MY THIRD UNANSWERED REQUEST FOR YOUR ACKNOWLEDGEMENT ON RECEIVING THE APPLICATION AND ITS ACCOMPANIED $195 FEE, AND FOR INFORMATION ON THE STATUS OF ITS PROCESS. PLEASE RESPOND TO THIS REQUEST.

    THANK YOU.

VERY TRULY YOURS,

MENACHEM PRI-HAR

## <u>CERTIFICATE OF SERVICE</u>

Petitioner, Menachem Pri-Har, hereby certifies under penalty of perjury, in compliance

with 28 U.S.C. §1746, that today I served a copy of the attached Second Motion for a Judgment

Directing Specific Acts by placing said copy in a first class post-paid envelope addressed to:

> AUSA Daryl F. Bloom
> U. S. Attorney's Office
> P. O. Box 11754
> Harrisburg, PA 17108-1754

and by depositing it in the mailbox at McRae Correctional Facility.

Dated: McRae, Georgia
      July 21, 2004

                                      MENACHEM PRI-HAR

MENACHEM PRI-HAR
# 34446-054
McRae C.F.
1000 Jim Hammock Dr.
McRae, GA 31055

JULY 21, 2004

MARY E. D'ANDREA, CLERK

UNITED STATES DISTRICT COURT

P. O. BOX 983

HARRISBURG, PENNSYLVANIA 17108

RE: PRI-HAR V. RENO et al.

ACTION No. 1:CV-00-1635

DEAR Ms. D'ANDREA:

    ENCLOSED PLEASE FIND AN ORIGINAL AND

TWO COPIES OF PETITIONER'S SECOND MOTION FOR

A JUDGMENT DIRECTING SPECIFIC ACTS, PURSUANT

TO RULE 70, Fed. R. Civ. P., FOR FILING IN THE

ABOVE-REFERENCED ACTION. KINDLY, RETURN TO

ME A COPY IN THE ATTACHED PRE-PAID ENVELOPE

STAMPED AS "FILED".

    THANK YOU.

            VERY TRULY YOURS,

            MENACHEM PRI-HAR

ENCLOSURES

c. AUSA DARYL F. BLOOM